903 P.2d 1246 (1995)
79 Hawai`i 425
PUBLIC ACCESS SHORELINE HAWAII, by Jerry ROTHSTEIN, its coordinator; and Angel Pilago, Appellants-Appellees-Respondents,
v.
HAWAI`I COUNTY PLANNING COMMISSION, by Fred Y. FUJIMOTO in his capacity as its chairman; and Nansay Hawaii, Inc., a Hawai`i corporation, Appellees-Appellants-Petitioners.
No. 15460.
Supreme Court of Hawai`i.
August 31, 1995.
*1249 Roy Vitousek, III (J. Robert Arnett, II, Nani Lee and John P. Powell of Cades, Schutte, Fleming and Wright, with him on the briefs), Honolulu, for Appellee-Petitioner Nansay Hawaii, Inc.
Joseph Kamelamela, Deputy Corporation Counsel (Michael J. Matsukawa with him on the briefs), Hilo, for Appellee-Petitioner Hawai`i County Planning Commission.
Skip Spaulding (Arnold L. Lum, Denise E. Antolini, Eric S. Walters, San Francisco, CA, and Lea O. Hong of Sierra Club Legal Defense Fund, with him on the briefs), Honolulu, for Appellants-Respondents Public Access Shoreline Hawaii and Angel Pilago.
David Kaapu, on the briefs, Kailua Kona, for the Kona Hawaiian Civic Club.
Mililani Trask, Kia`aina, on the briefs, Honolulu, for Ka Lahui Hawai`i.
David L. Callies, Orlando R. Davidson, and Gordon M. Arakaki, on the briefs, Honolulu, for the Land Use Research Foundation.
Carl C. Christensen, Alan T. Murakami, and Paul F.N. Lucas (Native Hawaiian Legal Corporation), on the briefs, Honolulu, for Pele Defense Fund.
Sherry P. Broder and Jon M. Van Dyke, on the briefs, Honolulu, for the Office of Hawaiian Affairs.
Steven S. Michaels and Girard D. Lau, Deputy Attorneys General, on the briefs, Honolulu, for the State of Hawai`i.
Hayden Aluli, on the briefs, Honolulu, for the `Ohana Council.
Williamson B.C. Chang and David Michael Foulkes, on the briefs, Honolulu, for Protect Kohanaiki `Ohana, Inc., Kalamaula Homestead Association, and the Native Hawaiian Environmental Defense Fund.
Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.
*1250 KLEIN, Justice.
We issued a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in this case, which concerns a challenge by Public Access Shoreline Hawaii (PASH) and Angel Pilago to the Hawai`i County Planning Commission's (HPC) decision denying them standing to participate in a contested case hearing on an application by Nansay Hawai`i, Inc. (Nansay) for a Special Management Area (SMA) use permit.
In order to pursue development of a resort complex on land within a SMA on the island of Hawai`i (Big Island), Nansay applied to the HPC for a SMA use permit. PASH, an unincorporated public interest membership organization based in Kailua-Kona, and Pilago opposed the issuance of the permit and requested contested case hearings before the HPC. The HPC denied the requests on the ground that, under its rules, neither PASH nor Pilago had standing to participate in a contested case. The HPC subsequently issued a SMA use permit to Nansay. When the case came before the circuit court, the court essentially vacated the permit by remanding to the HPC with instructions to hold a contested case hearing in which both PASH and Pilago would be allowed to participate. In other words, because the SMA permit was granted pursuant to flawed procedures, the circuit court implicitly concluded that the SMA permit was void. On appeal, the ICA affirmed the circuit court's order with respect to PASH and reversed it with respect to Pilago. For the reasons set forth below, we affirm the ICA's decision and remand the case to the HPC for proceedings consistent with this opinion.

I. BACKGROUND FACTS

The HPC received a SMA use permit application from Nansay for a resort development on the Big Island. Nansay sought approval of its plans to develop a community complex including: two resort hotels with over 1,000 rooms; 330 multiple family residential units; 380 single family homes; a golf course; a health club; restaurants; retail shops; an artisan village; a child care center; and other infrastructure and improvements over a 450 acre shoreline area in the ahupua`a[1] of Kohanaiki on the Big Island. On September 28, 1990, the HPC held a public hearing on Nansay's permit application, as required by the agency's rules. See County of Hawai`i Planning Commission, Rules of Practice and Procedure (HPC Rules) 9-11(B) (1992).[2] At the public hearing, many parties presented testimony, including Pilago and the coordinator of PASH. Various individuals and groups orally requested contested case hearings.[3]
On November 8, 1990, after further testimony and discussion, the HPC determined that PASH and Pilago's interests were "not clearly distinguishable from that of the general public" and, therefore, that they did not have standing to participate in a contested case. See HPC Rule 4-2(6)(B).[4] The HPC *1251 then voted to deny the contested case requests and to grant Nansay a SMA use permit.
PASH and Pilago sought review in circuit court of both agency decisions (denial of their contested case requests and issuance of the SMA use permit) pursuant to HRS §§ 91-14 and 205A-6 (1985).[5] The circuit court determined that the HPC erred in finding that PASH and Pilago did not have interests that were distinguishable from the general public. Accordingly, the court remanded the case with instructions for the HPC to grant PASH and Pilago a contested case hearing pursuant to its rules.
Nansay and the HPC appealed, and the ICA affirmed in part, holding that PASH was entitled to contested case hearing procedures. PASH I, at 253, 900 P.2d at 1317. The ICA's conclusion was based on its determination that the HPC "disregarded the rules regarding the gathering rights of native Hawaiians and its obligation to preserve and protect those rights." Id. In other words, the ICA determined that PASH's "interest in the proceeding was clearly distinguishable from that of the general public[.]" Id.[6] However, the ICA reversed the circuit court with respect to Pilago, explaining that his acknowledged "special" interest in the proceeding was not a sufficiently "personal" interest "clearly distinguishable from that of the general public." Id. at 254, 900 P.2d at 1318.
The HPC and Nansay subsequently applied for a writ of certiorari, which we granted on May 7, 1993.

II. THE RIGHTS OF A NON-APPEALING PARTY

Appeals from decisions of the ICA are governed by HRS § 602-59 (1985), which provides for an appeal only by application for writ of certiorari. State v. Bolosan, 78 Hawai`i 86, 88, 890 P.2d 673, 675 (1995). In the instant case, the ICA ruled against the HPC and Nansay with respect to PASH's claims, and against Pilago with respect to his claims. The HPC and Nansay accordingly filed applications for writs of certiorari.
Notwithstanding our October 28, 1993 order permitting Pilago's counsel to withdraw and allowing PASH's representative to appear as counsel for Pilago, Pilago never filed *1252 an application for writ of certiorari from the decision of the ICA. Accordingly, we decline to address Pilago's asserted rights in this opinion.

III. JURISDICTIONAL REQUIREMENTS

It is well-settled that "every court must ... determine as a threshold matter whether it has jurisdiction to decide the issue[s] presented." Pele Defense Fund v. Puna Geothermal Venture, 77 Hawai`i 64, 67, 881 P.2d 1210, 1213 (1994). Moreover, subject matter jurisdiction may not be waived and can be challenged at any time. Bush v. Hawaiian Homes Comm'n, 76 Hawai`i 128, 133, 870 P.2d 1272, 1277 (1994).
In the instant case, the HPC and Nansay argue that the circuit court lacked jurisdiction to consider PASH's claims. Nansay asserts further that the proper remedy for PASH to pursue was an action for declaratory judgment and/or an injunction, rather than an appeal under HRS § 91-14. PASH contends that the circuit court properly exercised appellate jurisdiction under HRS § 91-14.[7]
The necessary inquiry in this case, therefore, is whether PASH has met the requirements of HRS § 91-14: first, the proceeding that resulted in the unfavorable agency action must have been a "contested case" hearingi.e., a hearing that was 1) "required by law" and 2) determined the "rights, duties, and privileges of specific parties"; second, the agency's action must represent "a final decision and order," or "a preliminary ruling" such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved "in" the contested case; and finally, the claimant's legal interests must have been injuredi.e., the claimant must have standing to appeal. See generally Puna Geothermal, supra. In the remaining subsections of this part, we shall apply this test to the circumstances presented in this appeal.

A. Contested Case Hearing

In Puna Geothermal, we observed that "a contested case must have occurred before appellate jurisdiction may be exercised. A contested case is an agency hearing that 1) is required by law and 2) determines the rights, duties, or privileges of specific parties." 77 Hawai`i at 67-68, 881 P.2d at 1213-14 (citations and footnote omitted). In order for a hearing to be "required by law," it may be required by statute, agency rule, or constitutional due process. See id. at 68, 881 P.2d at 1214.
In the instant case, we need only look to agency rules promulgated under the authority of HRS § 205A-29 to find the hearing requirement.[8]See HPC Rule 9-11(B), supra note 2. In fact, the respective county planning commissions for all the neighbor *1253 islands are authorized under the Coastal Zone Management Act (CZMA), HRS chapter 205A, and in accordance with the Hawai`i Administrative Procedures Act (HAPA), HRS chapter 91, to establish rules governing the grant or denial of a SMA permit.[9]See, e.g., Chang v. Planning Comm'n, 64 Haw. 431, 436, 643 P.2d 55, 60 (1982). In the City and County of Honolulu, on the other hand, the relevant authority under the CZMA (specifically, the Honolulu City Council) is a legislative body that is exempt from HAPA. Sandy Beach Defense Fund v. City Council, 70 Haw. 361, 368, 773 P.2d 250, 255 (1989). No other law requires the Honolulu City Council to hold hearings on SMA applications. Id. at 376, 773 P.2d at 260. Similarly, in the County of Hawai`i, hearings are not required under the HPC Rules for cases involving SMA minor permit applications. Kona Old Hawaiian Trails v. Lyman, 69 Haw. 81, 734 P.2d 161 (1987).[10]
Next, we must determine whether the subject hearing determined the rights, duties, or privileges of a specific party. At this stage of the analysis, our inquiry is properly directed at the party whose application was under consideration by the HPC. See Puna Geothermal, 77 Hawai`i at 68, 881 P.2d at 1214; Bush, 76 Hawai`i at 136, 870 P.2d at 1280. During the proceeding initiated by the HPC on Sept. 28, 1990 and resumed on Nov. 8, 1990, Nansay "sought to have the legal rights, duties, or privileges of land in which it held an interest declared over the objections of other landowners and residents" of the area, including persons allegedly having constitutionally protected interests on the development site in Kohanaiki. Puna Geothermal, 77 Hawai`i at 68, 881 P.2d at 1214; Mahuiki v. Planning Comm'n, 65 Haw. 506, 513, 654 P.2d 874, 879 (1982). Consequently, we hold that the SMA use permit application proceeding before the HPC was a contested case.[11]

B. Finality for purposes of judicial review under § 91-14

The second element of our analysis requires us to determine whether PASH appealed *1254 from either "a final decision and order... or a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief[.]" HRS § 91-14(a). In Kona Old Hawaiian Trails, we held that the HPC's "decision to grant a minor permit [was not] `a final decision or order in a contested case' from which an appeal to court was possible." Id. at 90-91, 734 P.2d at 167. In that case, we looked to Hawai`i County Charter section 5-6.3 for the necessary provision granting appeal rights because the HPC Rules do not address judicial review of the grant or denial of a SMA minor permit.[12]Id. at 91 n. 11, 734 P.2d at 167 n. 11 (providing for appeal to the county zoning board of appeals (ZBA) under section 5-6.3 of the county charter). The appellants in Kona Old Hawaiian Trails did not avail themselves of this procedure; therefore, the courts could not properly exercise appellate jurisdiction.
In the instant case, PASH was not required to appear before the ZBA prior to seeking judicial review because HPC Rules 4-6(h) and 9-11(D)(5) provide for direct appeal to the third circuit court.[13] Furthermore, the HPC has already rendered its final views for the purposes of judicial review. See HRS § 205A-29, supra note 8 (indicating that "[a]ction on the [SMA use] permit shall be final unless otherwise mandated by court order"). Even if we were to accept the Petitioners' claim that PASH does not contest the actual grant of Nansay's SMA use permit, but see supra note 5, we would still hold that the circuit court properly exercised its appellate jurisdiction in this case. HPC Rule 4-6(h); see also In re Hawai`i Gov't Employees' Ass'n, 63 Haw. at 89, 621 P.2d at 364 (upholding appellate jurisdiction where the agency's preliminary ruling ended the proceedings with respect to a party seeking intervention in a contested case).

C. Participation, including compliance with agency rules

Under the third element of our analysis, PASH must demonstrate that it was involved, or participated, in the contested case hearing that culminated in the unfavorable decision. Puna Geothermal, 77 Hawai`i at 70, 881 P.2d at 1216 (citing Bush, 76 Hawai`i at 134, 870 P.2d at 1278; Mahuiki, 65 Haw. at 514-15, 654 P.2d at 879-80). Moreover, "[a]ppellants seeking judicial review under HRS § 91-14 must ... follow agency rules `relating to contested case proceedings... properly promulgated under HRS Chapter 91[.]'" Puna Geothermal, 77 Hawai`i at 67-68, 881 P.2d at 1213-14.
During the September 28, 1990 public hearing held by the HPC, PASH testified against the grant of a SMA use permit for Nansay's proposed development. Pursuant to HPC Rule 4-6(a), PASH also requested implementation of contested case procedures at this hearing as well as at the November 8, 1990 hearing. After the HPC denied its request, PASH sought judicial review under HRS § 91-14 (as directed by HPC Rule 4-6(h) and pursuant to a discussion between the HPC and its deputy corporation counsel).[14] Having followed the procedures set forth by the HPC, PASH's participation in *1255 the SMA use permit proceeding amounts to involvement "in a contested case" under HRS § 91-14(a). See Puna Geothermal, 77 Hawai`i at 70, 881 P.2d at 1216. The mere fact that PASH was not formally granted leave to intervene in a contested case is not dispositive because it did everything possible to perfect its right to appeal. See id. at 71, 881 P.2d at 1217 (discussing Jordan v. Hamada, 62 Haw. 444, 616 P.2d 1368 (1980), and East Diamond Head Ass'n v. Zoning Board, 52 Haw. 518, 479 P.2d 796 (1971)).

D. Standing as a "person aggrieved"

The remaining element in our jurisdictional analysis requires PASH to "demonstrate [that its] ... interests were injured[.]" Puna Geothermal, 77 Hawai`i at 69, 881 P.2d at 1215. Although the HPC Rules allow formal intervention through specified procedures, PASH was denied standing to participate in a contested case hearing because the agency found that its asserted interests were "substantially similar" to those of the general public. The HPC's restrictive interpretation of standing requirements is not entitled to deference. See id. at 67, 70, 881 P.2d at 1213, 1216 (citing Hawaii`s Thousand Friends v. Anderson, 70 Haw. 276, 283, 768 P.2d 1293, 1299 (1989); Akau v. Olohana Corp., 65 Haw. 383, 388-89, 652 P.2d 1130, 1134 (1982)). Cf. Mahuiki, 65 Haw. at 515, 654 P.2d at 880 (recognizing that "a decision to permit the [proposed] construction ... on undeveloped land in the [SMA] could only have an adverse effect on" the appellants' "essentially aesthetic and environmental" interests).[15] Accordingly, we review de novo whether PASH has demonstrated that its interests were injured.
We agree with the ICA's thorough assessment of PASH's standing. See PASH I, at 251-254, 900 P.2d at 1318-1321. Through unrefuted testimony, PASH sufficiently demonstrated that its members, as "native Hawaiian[s] who [have] exercised such rights as were customarily and traditionally exercised for subsistence, cultural, and religious purposes on undeveloped lands[,] [have] an interest in a proceeding for the approval of [a SMA permit] for the development of lands within the ahupua`a which are [sic] clearly distinguishable from that of the general public." Id. at 252, 900 P.2d at 1319. Although we hold that PASH sufficiently demonstrated standing to participate in a contested case, at least for the purposes of the instant appeal, we observe that "[o]pportunities shall be afforded all parties to present evidence and argument on all issues *1256 involved" in the contested case hearing held on remand. HRS § 91-9(c).
For the reasons discussed in subsections III.A. through D., supra, we hold that the circuit court had jurisdiction to determine the issues raised by PASH in this case.

IV. THE OBLIGATION TO PRESERVE AND PROTECT CULTURAL AND HISTORIC RESOURCES

Having established the jurisdiction of the courts in this case, we now turn to the substantive arguments advanced by Nansay and the HPC.[16]
Nansay argues that the HPC has no obligation under the CZMA or any other law to consider, much less require, protection of traditional and customary Hawaiian rights. The HPC concurs, adding that the ICA's opinion in PASH I places an undue burden on the CZMA process. In any event, the HPC contends that it did not disregard protection of gathering rights because the SMA permit contains a condition requiring establishment of a program for preserving and maintaining the anchialline ponds on the development site. Nansay and the HPC also contend that PASH failed to establish a prima facie claim of native Hawaiian gathering rightsspecifically, Nansay claims that the evidence only shows shrimp gathering at the ponds as far back as the late 1920's.

A. Obligations Under the CZMA

Within the scope of their authority, "all agencies" in Hawai`i must ensure that their rules comply with the objectives and policies of the CZMA. HRS §§ 205A-4(b) and -5. Moreover, the neighbor island county planning commissions and the Honolulu City Council are specifically required to give "full consideration ... to ... cultural ... [and] historic ... values as well as to needs for economic development" when implementing the objectives, policies, and SMA guidelines set forth in the CZMA. HRS § 205A-4(a) (emphasis added).
In accordance with statutory mandates, HPC Rule 9-11(C) provides that the relevant governmental authority may grant a SMA use permit only upon finding that the proposed development: (1) "will not have any significant adverse environmental or ecological effect";[17] (2) "is consistent with [CZMA] objectives and policies ... and the [SMA] guidelines";[18] and (3) "is consistent with the General Plan, Zoning Code and other applicable ordinances." A "significant adverse effect," for the purposes of deliberations upon *1257 a SMA permit application,[19] includes the expected primary or secondary consequences of a proposed development, as well as the shortand long-term effects or cumulative consequences of the proposal.
Accordingly, the HPC may not issue a SMA use permit unless it finds that the proposed project will not have any significant adverse effects. Cf. Hui Alaloa v. Planning Comm'n, 68 Haw. 135, 705 P.2d 1042 (1985). In Hui Alaloa, the Maui Planning Commission (MPC) failed to make the requisite finding that a proposed development on the island of Moloka`i was consistent with CZMA historic protection and preservation objectives. Notwithstanding the inclusion of permit conditions requiring the developer to retain a qualified archaeologist and to substantially comply with the CZMA and HAPA, we vacated the MPC's orders granting SMA permits.
The following factors, inter alia, may constitute significant adverse effects: (a) "an irrevocable commitment to loss or destruction of any natural or cultural resource, including but not limited to, historic sites and view planes"; (b) effects upon "the economic or social welfare and activities of the community, County or State"; and (c) actions "contrary to the objectives and policies of [the CZMA] and the [SMA] Guidelines[.]" HPC Rule 9-10(H)(1), (4) & (10) (emphases added). See also HPC Rule 9-6(A)(2); HRS § 205A-2(b)(2) (one of the CZMA's objectives and policies is to protect and preserve "those natural and manmade historic and prehistoric resources in the coastal zone management area that are significant in Hawaiian ... history and culture") (emphasis added). The interests asserted by PASH fall within these broad categories; therefore, they are entitled to protection under the CZMA.[20]See HRS § 205A-21 (finding that "special controls on development are necessary to avoid permanent losses of valuable resources and the foreclosure of management options, and to ensure ... adequate access"); HPC Rule 9-11(C) (authorizing the the HPC to attach "reasonable terms and conditions" to SMA permits); cf. Hammond v. North Slope Borough, 645 P.2d 750, 761-62 (Alaska 1982) (holding that Alaska's version of the CZMA requires its agencies to "assure opportunities for subsistence usage of coastal areas and resources" and to issue development permits only where consistent with Alaska's environmental and cultural interests).
In order for any conditions placed on a SMA permit issued by the HPC on remand to be deemed "reasonable," they must bear an essential nexus to legitimate State interests and must be "roughly proportional" to the impact of the proposed development. See infra section V.B. (discussing the respective requirements from Nollan v. California Coastal Comm'n, 483 U.S. 825, 836, 107 S.Ct. 3141, 3148, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, ___ U.S. ___, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)). Here, the relevant State interests are reflected in article XII, section 7 of the Hawai`i Constitution (1978) and HRS § 1-1. See infra section IV.B. In other words, the HPC may require dedications appropriately tailored to the special *1258 and quantifiable burdens associated with granting discretionary benefits to Nansay, through a SMA permit, which facilitate development of the company's land. Conditions that ensure continued access to the subject property for the legitimate and reasonable practice of customary and traditional rights would presumably comply with constitutional prohibitions against the uncompensated taking of private property. See infra section V.B.

B. Obligations Under Article XII, Section 7 of the Hawai`i Constitution and HRS § 1-1

In addition to the requirements of the CZMA, the HPC is obligated to protect customary and traditional rights to the extent feasible under the Hawai`i Constitution and relevant statutes. Article XII, section 7 of the Hawai`i Constitution (1978) provides:
The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua`a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

(Emphases added.) HRS § 1-1 (Supp.1992) provides:
The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of [Hawai`i] in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the State.
(Emphasis added.)[21]
The aforementioned provisions were discussed by this court, in the context of an individual's asserted gathering rights, in Kalipi v. Hawaiian Trust Co., 66 Haw. 1, 656 P.2d 745 (1982). Ten years later, in Pele Defense Fund v. Paty, supra, we recognized *1259 that ancient Hawaiian gathering rights may have extended beyond the boundaries of individual ahupua`a in certain cases. 73 Haw. at 620, 837 P.2d at 1272. Nevertheless, neither Kalipi nor Pele precluded further inquiry concerning the extent that traditional practices have endured under the laws of this State. "In Kalipi, we foresaw that `[t]he precise nature and scope of the rights retained by § 1-1 would, of course, depend upon the particular circumstances of each case.'" Pele, 73 Haw. at 619, 837 P.2d at 1271 (quoting Kalipi, 66 Haw. at 12, 656 P.2d at 752).
In order to determine whether the HPC must protect traditional and customary rights of the nature asserted in this case, we shall first review our analysis of gathering rights in Kalipi and Pele. Then we shall clarify the status of customary rights in general, as a result of relevant judicial and legislative developments in Hawaiian history. Finally, we will provide the HPC with some specific, although not necessarily exhaustive, guidelines to aid its future deliberations in the event that Nansay elects to pursue its challenges to the legitimacy of PASH's claims.

1. Kalipi v. Hawaiian Trust Co.: judicial recognition of traditional Hawaiian gathering rights based upon residency in a particular ahupua`a

Kalipi involved an individual's attempt to gain access to private property on the island of Moloka`i in order to exercise purportedly traditional Hawaiian gathering rights. The court prefaced its consideration of Kalipi's claims with a discussion of the State's obligation to preserve and enforce traditional Hawaiian gathering rights under article XII, section 7 of the Hawai`i Constitution:
We recognize that permitting access to private property for the purpose of gathering natural products may indeed conflict with the exclusivity traditionally associated with fee simple ownership of land. But any argument for the extinguishing of traditional rights based simply upon the possible inconsistency of purported native rights with our modern system of land tenure must fail.

66 Haw. at 4, 656 P.2d at 748 (emphasis added).
The court then began its analysis of Kalipi's asserted gathering rights by interpreting HRS § 7-1 (1985)[22] so as to essentially "conform these traditional rights born of a culture which knew little of the rigid exclusivity associated with the private ownership of land, with a modern system of land tenure in which the right to exclude is perceived to be an integral part of fee simple title." Id. at 7, 656 P.2d at 749 (emphasis added). Accordingly, the court fashioned a rule permitting "lawful occupants of an [ahupua`a] ... [to] enter undeveloped lands within the [ahupua`a] *1260 to gather those items enumerated in the statute [HRS § 7-1]." Id. at 7-8, 656 P.2d at 749.
The requirement that these rights be exercised on undeveloped land is not, of course, found within the statute. However, if this limitation were not imposed, there would be nothing to prevent residents from going anywhere within the [ahupua`a], including fully developed property, to gather the enumerated items.[23]In the context of our current culture this result would so conflict with understandings of property, and potentially lead to such disruption, that we could not consider it anything short of absurd and therefore other than that which was intended by the statute's framers. Moreover, it would conflict with our understanding of the traditional Hawaiian way of life in which cooperation and non-interference with the well-being of other residents were integral parts of the culture.

Similarly the requirement that the rights be utilized to practice native customs represents, we believe, a reasonable interpretation of the Act as applied to our current context. The gathering rights of § 7-1 were necessary to insure the survival of those who, in 1851, sought to live in accordance with the ancient ways. They thus remain, to the extent provided in the statute, available to those who wish to continue those ways.
Id. at 8-9, 656 P.2d at 749-50 (citation omitted) (footnote and emphasis added).
Because Kalipi did not actually reside within the subject ahupua`a, the court held that he was not entitled to exercise HRS § 7-1 gathering rights there. Id. at 9, 656 P.2d at 750. Nevertheless, the court specifically refused to decide the ultimate scope of traditional gathering rights under HRS § 1-1 because there was "an insufficient basis to find that such rights would, or should, accrue to persons who did not actually reside within the [ahupua`a] in which such rights are claimed." Id. at 12, 656 P.2d at 752 (emphasis added). In other words, Kalipi did not foreclose the possibility of establishing, in future cases, traditional Hawaiian gathering and access rights in one ahupua`a that have been customarily held by residents of another ahupua`a.

2. Pele Defense Fund v. Paty: judicial recognition of traditional access and gathering rights based upon custom

Pele involved, inter alia, the assertion of customarily and traditionally exercised subsistence, cultural, and religious practices in the Wao Kele `O Puna Natural Area Reserve on the Big Island. For the purposes of summary judgment, we held that there was a sufficient basis to find that gathering rights can be claimed by persons who do not reside in the particular ahupua`a where they seek to exercise those rights. Pele, 73 Haw. at 621, 837 P.2d at 1272 (reversing summary judgment and remanding for trial on this issue). We specifically held that "native Hawaiian rights protected by article XII, § 7 may extend beyond the ahupua`a in which a native Hawaiian resides." Pele, 73 Haw. at 620, 837 P.2d at 1272. In so holding, we explicated the discussion of gathering rights in Kalipi by recognizing that a claim based on practiced customs raises different issues than assertions premised on mere land ownership.
Unlike Kalipi, [Pele Defense Fund] members assert native Hawaiian rights based on the traditional access and gathering patterns of native Hawaiians in the Puna region. Because Kalipi based his claims entirely on land ownership, rather than on the practiced customs of Hawaiians on [Moloka`i], the issue facing us is somewhat different from the issue in Kalipi.

Pele, 73 Haw. at 618-19, 837 P.2d at 1271.
Although we later mentioned "other requirements of Kalipi" with approvalimplicitly *1261 referring to the "undeveloped lands" and "no actual harm" requirements of Kalipi, see 73 Haw. at 621, 837 P.2d at 1272our holding in Pele was not intended to foreclose argument regarding those requirements in future, unrelated cases involving assertions of customary and traditional rights under HRS § 1-1. "In Kalipi, we foresaw that `[t]he precise nature and scope of the rights retained by § 1-1 would, of course, depend upon the particular circumstances of each case.'" Pele, 73 Haw. at 619, 837 P.2d at 1271 (quoting Kalipi, 66 Haw. at 12, 656 P.2d at 752).

3. The "other requirements of Kalipi"

In addition to creating the "undeveloped land" requirement, see Kalipi, 66 Haw. at 7-8, 656 P.2d at 749, the court in Kalipi made the following observations concerning claims of traditional gathering rights under HRS § 1-1:[24]
We perceive the Hawaiian usage exception to the adoption of the common law to represent an attempt on the part of the framers of the statute to avoid results inappropriate to the isles' inhabitants by permitting the continuance of native understandings and practices which did not unreasonably interfere with the spirit of the common law. The statutory exception is thus akin to the English doctrine of custom whereby practices and privileges unique to particular districts continued to apply to the residents of those districts even though in contravention of the common law. This is not to say that we find that all the requisite elements of the doctrine of custom were necessarily incorporated in § 1-1. Rather we believe that the retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area.

In this case, Plaintiff's witnesses testified at trial that there have continued in certain [ahupua`a] a range of practices associated with the ancient way of life which required the utilization of the undeveloped property of others and which were not found in § 7-1.[25] Where these practices have, without harm to anyone, been continued, we are of the opinion that the reference to Hawaiian usage in § 1-1 insures their continuance for so long as no actual harm is done thereby.

Oni v. Meek, [2 Haw. 87, (1858)], does not preclude this conclusion, for in that case the application of the doctrine of custom was argued and the doctrine itself was not rejected.... Moreover, the language in Oni respecting the conclusiveness of § 7-1 does not necessarily preclude application of the doctrine.
Id. at 10-11, 656 P.2d at 751 (citations omitted) (footnote renumbered and internal citation *1262 added) (emphases added).[26] In reaching its conclusion regarding the continued existence of customary rights, the Kalipi court necessarily rejected the appellee's contentions that 1) "any customary rights which might otherwise have been retained by § 1-1 have been abrogated by judicial precedent[,]" and 2) "no customary rights other than those found in ... [HRS § 7-1] survived the [M&amacr;hele]."[27]Id. at 9-10, 656 P.2d at 750. Oni does not stand for the proposition that customary rights, which had not yet been formally established through judicial proceedings, were extinguished sub silentio by the M&amacr;hele or its associated legal developments. Oni merely rejected one particular claim based upon an apparently non-traditional practice that had not achieved customary status in the area where the right was asserted.
The Kalipi court implicitly acknowledged the possibility of recognizing certain customary rights, under HRS § 1-1, to gather items that are not specifically delineated in HRS § 7-1. See supra note 25 & accompanying text (quoting Kalipi, 66 Haw. at 10 & n. 4, 656 P.2d at 751 & n. 4). However, the court did not fully embrace the opportunity to clarify Oni with respect to the potential application of the doctrine of custom.[28] We believe that the Kalipi court's preoccupation *1263 with residency requirements under HRS § 7-1 obfuscated its cursory examination of Kalipi's alternative claim based on customarily and traditionally exercised Hawaiian rights.[29] Accordingly, we read the discussion of customary rights in Oni and Kalipi as merely informing us that the balance of interests and harms clearly favors a right of exclusion for private property owners as against persons pursuing non-traditional practices or exercising otherwise valid customary rights in an unreasonable manner.
On the other hand, the reasonable exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7. See Pele, 73 Haw. at 618-21, 837 P.2d at 1269-72 (holding that rights primarily associated with residence in a particular ahupua`a under HRS § 7-1 might have extended beyond those bounds through ancient Hawaiian custom preserved in HRS § 1-1); id. at 620, 837 P.2d at 1272 (holding that article XII, section 7 reaffirmed "all such rights"). Traditional and customary rights are properly examined against the law of property as it has developed in this state. Thus, the regulatory power provided in article XII, section 7 does not justify summary extinguishment of such rights by the State merely because they are deemed inconsistent with generally understood elements of the western doctrine of "property."

4. The development of private property rights in Hawai`i

Some of the generally understood western concepts of property rights were discussed in Reppun v. Board of Water Supply, 65 Haw. 531, 656 P.2d 57 (1982).
The western doctrine of "property" has traditionally implied certain rights. Among these are the right to the use of the property, the right to exclude others[,] and the right to transfer the property with the consent of the "owner". In conformance with creation of private interests in land, each of these rights were embodied in the delineation of post-[M&amacr;hele] judicial water rights. Ostensibly, this judge-made system of rights was an outgrowth of Hawaiian custom in dealing with water. However, the creation of private and exclusive interests in water, within a context of western concepts of property, compelled *1264 the drawing of fixed lines of authority and interests which were not consonant with Hawaiian custom.
Id. at 547, 656 P.2d at 68. Although the court in Reppun focused on interests in water, its discussion of the development of Hawaiian property rights is enlightening.
In 1840 the first constitution of the Kingdom of [Hawai`i] proclaimed that although all property belonged to the crown "it was not his private property. It belonged to the Chiefs and the people in common, of whom [the King] was the head, and had the management of the landed property." [Hawai`i] Const. of 1840 in Fundamental Laws of Hawaii 3 (1904). Thus, prior to the [M&amacr;hele], all land remained in the public domain. However, other laws passed during the same period lay the foundation for the eventual imposition of private property rights in land by limiting the King's and landlords' heretofore unregulated authority to disseize one to whom land had been granted and insuring certain rights of the common people and lesser lords.
Id. at 542, 656 P.2d at 65.
The 1839 Declaration of Rights, which was incorporated into the 1840 Constitution, provided that "nothing whatever shall be taken from any individual except by express provision of the laws." Thurston, Fundamental Law of Hawaii 1 (emphasis added) [hereafter Fundamental Law]. See also Kekiekie v. Dennis, 1 Haw. 42, 43 (1851) (recognizing that the rights of each hoa`&amacr;ina, or ahupua`a tenant, were secured by the 1840 constitution). Several laws enacted in 1839 and 1840, and later compiled in the Laws of 1842, permitted the extinguishment of tenant rights in limited circumstances. See, e.g., Act of Nov. 9, 1840, ch. III, § 7, reprinted in Fundamental Law at 20 (excepting from restoration to previous holders those residuum lands that were separated from their affiliated lands for reasons of public interest); Fundamental Law at 43 (providing compensation for incursions related to road-building); id. at 133-35 (permitting dispossession of tenants because of idleness, where such idleness is proven at trial).
The 1840 constitution reflected an attempt to deal with chiefs and foreigners who sought to vest land rights without the required consent of the King. See Kuykendall, The Hawaiian Kingdom 1778-1854 (1938) [hereafter Kuykendall].[30] Gun-boats frequently came to Hawai`i to enforce the claims of foreigners. Levy, "Native Hawaiian Land Rights," 63 Cal.L.Rev. 848, 852 (1975) [hereafter Levy]; Kuykendall at 153. For example, British Consul Richard Charlton claimed a valuable piece of land based upon a 299-year lease supposedly obtained from a Hawaiian named Kalanim&omacr;k&umacr; in 1826. Kuykendall at 208. Kalanim&omacr;k&umacr; was a husband of the dowager Queen Ka`ahumanu and also served as a *1265 guardian of the young King Kamehameha III. The lease purportedly covered land occupied by Charlton as well as an adjoining piece, which had been occupied since 1826 by the retainers of Queen Ka`ahumanu. Id. at 208-09. Kamehameha III rejected this claim in 1840 for various reasons, including absence of legitimate authority to make the grant. Id. at 209. Conflicts exacerbated by further adverse decisions of the King and the Hawaiian courts, see id. at 208-12, eventually led to the provisional cession of Hawai`i on February 25, 1843, under threat of violence, to Lord George Paulet, commander of the British warship Carysfort.[31]Id. at 216; Levy at 852. Although Hawaiian independence was reaffirmed on July 31, 1843, these events would have a profound impact on future socio-political developments in the islands.
The minutes of a Privy Council meeting on October 9, 1845 reveal the continuing belief that "nothing but difficulties, even though we should be without fault, would result from the system of Reports of Foreign Consuls, being supported, and their complaints redressed without inquiry, by the Naval Forces of their nations." 1 Privy Council Records at 89, 91. Later, during the kingdom's ongoing efforts to resolve Charlton's land claim, additional claims surfaced. The minutes of another Privy Council meeting indicate:
The King remarked, ... give up this new claim, and then the General will claim the whole harbour. They all agreed that in some way or other, not disrespectful to the British Government, an end must be put to these pretensions coming upon them unexpectedly, contrary to all the law and usage among them.

Id. at 147 (emphasis added).
Consequently, the development of private property rights was deemed "indispensable" to the "political existence" of the kingdom. L. 1845-46, at 5. Furthermore, the "increase of foreign commerce and the enhanced value of property ... required something more of the Hawaiian courts than mere investigation of facts." Id. ("The events of the late Provisional Cession to Great Britain conclusively prove that some more minute and extensive judicature was long since requisite."). See also 2 Privy Council Records 231 (1846-47) (discussing a "compromise for the sake of peace" in another dispute with foreigners). At the time, native Hawaiian subjects frequently petitioned Kamehameha III regarding the dramatic changes taking place in the kingdom. See, e.g., petition signed by 301 residents of L&amacr;na`i, dated April 1845, Hawai`i State Archives (HSA), Interior Dept., Miscellaneous File (asking the King not to appoint foreign Ministers, and not to sell any more land to foreigners, because "[w]e are afraid that the wise will step on the ignorant"); The Friend, vol. III, no. XV, August 1, 1845, at 118-19 (reprinting a similar petition, signed by over 1600 people).[32]
The next major step in the evolution of private property rights was the formation *1266 in 1845 of the Board of Land Commissioners to quiet land titles. See Law Creating the Board to Quiet Land Titles, in Fundamental Laws of Hawaii 137 (1904). It was the Land Commission's responsibility to ascertain or reject claims of interests in land brought before it. Decisions of the Board were to be made in accordance with the civil law and native customs of the Kingdom.[33] The Board itself was not empowered to grant fee simple title to land. Rather, its duty was to define each applicant's identifiable interests in land and issue an award describing those interests. Actual title to land could be gained only by a payment of commutation to the Kingdom and issuance of a royal patent. See, Chinen, The Great Mahele: Hawaii's Land Division of 1848 (1958).
To carry out its duties, the Land Commission adopted principles that were to be followed in quieting title to land. The principles were subsequently also adopted by the legislative council of the Kingdom and were made binding rules by which all claims to land would be tested. Laws of 1847, at 81, RLH 1925, Vol. II at 2124. In its statement of principles the Land Commission related the necessity of its establishment to the unenforceability of the laws passed at the time of the Constitution of 1840 noting that:
Neither the laws of 1839 nor of 1840 were found adequate to protect the inferior lords and tenants, for although the violators of law, of every rank, were liable to its penalty, yet it was so contrary to ancient usage, to execute the law on the powerful for the protection of the weak, that the latter often suffered, and it was found necessary to adopt a new system for ascertaining rights, and new measures for protecting those rights when ascertained, and to accomplish this object the Land Commission was formed.
The Land Commission therefore viewed its responsibilities as including the actualization of the laws of 1839 and 1840, among them, of course, the law[s] governing ... [residuum lands and dispossession of tenants, see selected provisions from the compiled Laws of 1842, supra this section].
Thus, when in the next paragraph the Board reserves from allocation to private persons "the sovereign prerogatives" of the King, including the power:
To encourage and even to enforce the usufruct of lands for the common good[,]
it is clear that in accordance with preexisting civil law and native usage, the Commission intended to reserve to the sovereign the right to regulate ... [undeveloped land] in accord with the needs of the people of the Kingdom.
Reppun, 65 Haw. at 543-44, 656 P.2d at 66 (footnote added) (bracketed material inserted in place of references to interests in water). See also McBryde, 54 Haw. at 184-86, 504 P.2d at 1337-38 (indicating that the M&amacr;hele proclaimed Kamehameha's intention to "share" the lands with his people, and that confirmation of title was subject to inalienable sovereign prerogatives). Thus, the Land Commission's principles included appropriate provisions intended to preclude the konohiki from "dispos[ing] of the grass land as to leave ... his hoaainas [sic] destitute" and to preclude the government from selling "unoccupied" or "vacant" land so "as to leave the [hoa`&amacr;ina] destitute." L.1847, at 70-72 (citing §§ 2 and 6 of Act of November 7, 1846).[34]
After the M&amacr;hele, the Privy Council considered the rights of tenants under the new *1267 system of private land ownership and proposed a resolution providing that:
the rights of the makaainanas [sic] to firewood, timber for house, grass for thatching, ki leaf, water for household purposes in said land, and the privilege of making salt and taking certain fish from the seas adjoining said lands shall be and is hereby sacredly reserved and confirmed to them for their private use [should they need them] but not for sale ... provided, that before going for firewood, timber for houses and grass for thatching, said makaainanas [sic] shall give notice to the Lord or his luna resident therein.
3B Privy Council Records 681, 687 (1850).[35] The King responded, however, by expressing his concern that "a little bit of land even with allodial title, if they were cut off from all other privileges, would be of very little value[.]" Id. at 713. Accordingly, the final resolution was passed with the comment that "the proposition of the King, which he inserted as the seventh clause of the law, a rule for the claims of the common people to go to the mountains, and the seas attached to their own particular land exclusively, is agreed to[.]" Id. at 763; see L. 1850, § 7, at 203-04. Provisions of the law requiring the landlord's consent were repealed the following year because "many difficulties and complaints have arisen from the bad feeling existing on account of the Konohiki's [sic] forbidding the tenants on the lands enjoying the benefits that have been by law given them." L. 1851, at 98.
Given the preservation of Hawaiian usage in conjunction with the transition to a new system of land tenure, see, e.g., supra note 21 (outlining the continued reliance on custom and usage throughout the kingdom's legal history, which was adopted as the law of the territory upon annexation of these islands to the United States); supra note 33 (quoting L. 1845-46, at 109),[36] it is doubtful that "accept[ance]" of traditional and customary rights was required or that recognition of such rights would have "fundamentally violat[ed] the new system." Kalipi, 66 Haw. at 11 n. 5, 656 P.2d at 751 n. 5.[37]See supra section IV.B.3 (indicating that Kalipi implicitly rejected the argument that customary rights were extinguished by the specification *1268 of tenant rights in the 1846, 1850, and 1851 legislative enactments).
Our examination of the relevant legal developments in Hawaiian history leads us to the conclusion that the western concept of exclusivity is not universally applicable in Hawai`i. Cf. Stevens v. City of Cannon Beach, 317 Or. 131, 143, 854 P.2d 449, 456 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1332, 127 L.Ed.2d 679 (1994) (holding that "[w]hen plaintiffs took title to their land, they were on [constructive] notice that exclusive use ... was not part of the `bundle of rights' that they acquired"). In other words, the issuance of a Hawaiian land patent confirmed a limited property interest as compared with typical land patents governed by western concepts of property. Cf. United States v. Winans, 198 U.S. 371, 384, 25 S.Ct. 662, 665, 49 L.Ed. 1089 (1905) (observing that the United States Congress was competent "to secure to the Indians such a remnant of the great rights they possessed").
Although this premise clearly conflicts with common "understandings of property" and could theoretically lead to disruption, see Kalipi, 66 Haw. at 8-9, 656 P.2d at 750, the non-confrontational aspects of traditional Hawaiian culture should minimize potential disturbances. See, e.g., supra note 23 and infra note 43. In any event, we reiterate that the State retains the ability to reconcile competing interests under article XII, section 7. We stress that unreasonable or non-traditional uses are not permitted under today's ruling. See, e.g., Winans, 198 U.S. at 379, 25 S.Ct. at 663, 49 L.Ed. 1089 (noting that the trial court found "that it would `not be justified in issuing process to compel the defendants to permit the Indians to make a camping ground of their property while engaged in fishing'") (emphasis added).[38]
There should be little difficulty accommodating the customary and traditional Hawaiian rights asserted in the instant case with Nansay's avowed purposes. A community development proposing to integrate cultural education and recreation with tourism and community living represents a promising opportunity to demonstrate the continued viability of Hawaiian land tenure ideals in the modern world.

5. Customary Rights under Hawai`i law

The Kalipi court properly recognized that "all the requisite elements of the doctrine of custom were [not] necessarily incorporated in § 1-1." 66 Haw. at 10, 656 P.2d at 751.83101883 Accordingly, HRS § 1-1 represents the codification of the doctrine of custom as it applies in our State. One of the most dramatic differences in the application of custom in Hawai`i is that passage of HRS § 1-1's predecessor fixed November 25, 1892 as the date Hawaiian usage must have been established in practice. Compare State v. Zimring [Zimring II], 58 Haw. 106, 115 n. 11, 566 P.2d 725, 732 n. 11 (1977) (citing State v. Zimring [Zimring I], 52 Haw. 472, 479 P.2d 202 (1970)), with Oni, 2 Haw. at 90 (implying that the "time immemorial" standard "is entitled to great weight" but declining to express a conclusive opinion).[39]
Other differences in the doctrine's applicability are readily discernible. For example, *1269 under English common law, "a custom for every inhabitant of an ancient messuage [meaning "[d]welling-house with the adjacent buildings and curtilage[,]" see Black's Legal Dictionary 990 (6th ed.1990)] within a parish to take a profit a prendre in the land of an individual is bad." Blackstone's Commentaries, at 78 n. 18. Strict application of the English common law, therefore, would apparently have precluded the exercise of traditional Hawaiian gathering rights. As such, this element of the doctrine of custom could not apply in Hawai`i. See supra note 21 (discussing the prominent status of custom throughout Hawaiian legal history).
In light of the confusion surrounding the nature and scope of customary Hawaiian rights under HRS § 1-1, the following subsections of this opinion discuss applicable requirements for establishing such rights in the instant case.

a.
Nansay argues that the recognition of rights exercised by persons who do not actually reside in the subject ahupua`a "represents such a departure from existing law ... [that Pele] should be overruled or strictly limited to its specific facts." Nansay's Third Supp. Brief, at 2-3 n. 1. Nansay contends further that Pele is inconsistent with the fundamental nature of Hawaiian land tenure, which allegedly recognizes only three classes: government, landlord, and tenant. Id. at 3-4; see Principles adopted by Land Commission (1847), reprinted in 2 Revised Laws of Hawai`i (RLH), at 2124-37 (1925).
We decline Nansay's invitation to overrule Pele; on the contrary, we reaffirm it and expressly deem the rules of law posited therein to be applicable here. In Pele, we held that article XII, section 7, which, inter alia, obligates the State to protect customary and traditional rights normally associated with tenancy in an ahupua`a, may also apply to the exercise of rights beyond the physical boundaries of that particular ahupua`a. Pele, 73 Haw. at 620, 837 P.2d at 1272; see also Palama v. Sheehan, 50 Haw. 298, 300-01, 440 P.2d 95, 97 (1968) (noting that Hawaiians did not necessarily reside in the same place that they exercised traditional rights). Although it is not clear that customary rights should be limited by the term "tenant," see supra note 27, we are nonetheless aware that the "tenant" class includes at least one sub-class. See 2 RLH (1925), at 2124, 2126 (mentioning a "lowest class of tenants," "lower orders" and "sub-tenants," apparently from the Hawaiian terms "l&omacr;p&amacr; ma lalo," "hoa`&amacr;ina ma lalo," and "l&omacr;p&amacr;"). Therefore, we hold that common law rights ordinarily associated with tenancy do not limit customary rights existing under the laws of this state.

b.
In the context of an argument challenging the Pele Defense Fund's (PDF) standing to bring its claim, as raised on appeal in Pele, we made passing reference to the circuit court's finding that PDF's membership included persons of "fifty percent or more Hawaiian blood[.]" 73 Haw. at 615 n. 28, 837 P.2d at 1269 n. 28; see also 73 Haw. at 620 n. 34, 837 P.2d at 1272 n. 34 (citing affidavits of persons with at least one-half native Hawaiian blood). Because the lower court's relevant factual determination was not challenged on appeal, we did not disturb this finding in Pele.
Nevertheless, these references in Pele were not intended to imply our endorsement of a fifty percent blood quantum requirement *1270 for claims based upon traditional or customary Hawaiian rights. The definition of the term "native Hawaiian" in the Hawaiian Homes Commission Act (HHCA)[40] is not expressly applicable to other Hawaiian rights or entitlements. Furthermore, the word "native" does not appear in HRS § 1-1. Because a specific proposal to define the terms "Hawaiian" and "native Hawaiian" in the 1978 Constitutional Convention was not validly ratified, the relevant section was deleted from the 1985 version of the HRS. See Kahalekai v. Doi, 60 Haw. 324, 342, 590 P.2d 543, 555 (1979). Consequently, those persons who are "descendants of native Hawaiians who inhabited the islands prior to 1778," and who assert otherwise valid customary and traditional Hawaiian rights under HRS § 1-1, are entitled to protection regardless of their blood quantum. Haw. Const., art XII, § 7 (emphasis added).[41] Customary and traditional rights in these islands flow from native Hawaiians' pre-existing sovereignty. The rights of their descendants do not derive from their race per se, and were not abolished by their inclusion within the territorial bounds of the United States. See Organic Act, § 83; Act of April 30, 1900, c. 339, 31 Stat. 141, 157, reprinted in 1 HRS 36, 74 (1985) (as amended).

c.
The court in Kalipi suggested that the "Hawaiian usage exception in § 1-1 may be used as a vehicle for the continued existence of those customary rights which continued to be practiced[.]" 66 Haw. at 11-12, 656 P.2d at 751-52. See also id. at 10, 656 P.2d at 751 (indicating the court's belief that "retention of a Hawaiian tradition should in each case be determined by balancing the respective interests and harm once it is established that the application of the custom has continued in a particular area") (emphasis added); Pele, 73 Haw. at 619, 837 P.2d at 1271 (reading Kalipi as upholding the right "to practice continuously exercised rights ... so long as no actual harm [is] done by the practice") (emphasis added). The court in Zimring II noted further that although "usage must be based on actual practice" and not on assumptions or conjecture, the establishment of traditional usage "would be of little weight" because the practice "would not have carried over into a private property regime within the framework of a private enterprise economic system." 58 Haw. at 116-18, 566 P.2d at 732-33. On the other hand, the Kalipi court also indicated that the traditional practices enumerated under HRS § 7-1 remain "available to those who wish to continue those ways." Id. at 9, 656 P.2d at 750 (emphasis added).
Contrary to the dictum in Zimring II, supra, the ancient usage of lands practiced by Hawaiians did, in fact, carry over into the new system of property rights established through the Land Commission. Compare Zimring II, 58 Haw. at 116-18, 566 P.2d at 732-33, with Kukiiahu v. Gill, 1 Haw. 54 (1851), and Kekiekie, 1 Haw. at 43 (recognizing that ahupua`a tenant's rights were secured by the constitution and could not have been conveyed away "even if the King had not made [the kuleana] reservation[s,]" see supra note 24). See also supra *1271 notes 21, 33, and 36 (citing statutory authority and case law that supports this conclusion). Furthermore, the reservation of sovereign prerogatives, see supra section IV.B.4 (citing Reppun, 65 Haw. at 543-44, 656 P.2d at 66; McBryde, 54 Haw. at 184-86, 504 P.2d at 1337-38), in conjunction with limitations on the Land Commission's authority, see supra section IV.B.4 (citing L. 1847, at 70-72),[42] confirms that fee simple title in Hawai`i is specifically limited by the sovereign authority to regulate its use. In other words, the right of each ahupua`a tenant to exercise traditional and customary practices remains intact, notwithstanding arguable abandonment of a particular site, although this right is potentially subject to regulation in the public interest. See supra note 26 (citing Blackstone's Commentaries for the proposition that continuous exercise is not absolutely required to maintain the validity of a custom).

d.
We have stated previously that rights of access and collection will not necessarily prevent landowners from developing their lands. Pele, 73 Haw. at 621 n. 36, 837 P.2d at 1272 n. 36 (reiterating "the early holding that article XII, [section] 7 does not require the preservation of ... [undeveloped] lands in their natural state" and that "Kalipi rights only guarantee access to undeveloped lands"); see also Kalipi, 66 Haw. at 8 n. 2, 656 P.2d at 749 n. 2. Our analysis in the instant case is consistent with these cases.[43]
The Kalipi court justified the imposition of a non-statutory "undeveloped land" requirement by suggesting that the exercise of traditional gathering rights on fully developed property "would conflict with our understanding of the traditional Hawaiian way of life in which cooperation and non-interference with the well-being of other residents were integral parts of the culture." 66 Haw. at 9, 656 P.2d at 750 (emphasis added). The court also stated that, without the undeveloped land limitation, "there would be nothing to prevent residents from going anywhere within the ahupua`a, including fully developed property, to gather the enumerated items." Id. at 8, 656 P.2d at 750 (emphasis added); but see supra note 23. However, the court did not expressly hold that the exercise of customary gathering practices would be absurd or unjust when performed on land that is less than fully developed.
For the purposes of this opinion, we choose not to scrutinize the various gradations in property use that fall between the terms "undeveloped" and "fully developed." Nevertheless, we refuse the temptation to place undue emphasis on non-Hawaiian principles of land ownership in the context of evaluating deliberations on development permit applications. Such an approach would reflect an unjustifiable lack of respect for gathering activities as an acceptable cultural usage in pre-modern Hawai`i, see HRS § 5-7.5 (Supp. 1992),[44] which can also be successfully incorporated in the context of our current culture. Contrary to the suggestion in Kalipi that there would be nothing to prevent the unreasonable exercise of these rights, article XII, *1272 section 7 accords an ample legal basis for regulatory efforts by the State. See also supra note 23 (citing evidence suggesting that ancient Hawaiian usage was self-regulating). In other words, the State is authorized to impose appropriate regulations to govern the exercise of native Hawaiian rights in conjunction with permits issued for the development of land previously undeveloped or not yet fully developed.
Depending on the circumstances of each case, once land has reached the point of "full development" it may be inconsistent to allow or enforce the practice of traditional Hawaiian gathering rights on such property. However, legitimate customary and traditional practices must be protected to the extent feasible in accordance with article XII, section 7. See supra note 43. Although access is only guaranteed in connection with undeveloped lands, and article XII, section 7 does not require the preservation of such lands, the State does not have the unfettered discretion to regulate the rights of ahupua`a tenants out of existence.
Thus, to the extent feasible, we hold that the HPC must protect the reasonable exercise of customary or traditional rights that are established by PASH on remand.

V. NONE OF NANSAY'S PROPERTY INTERESTS HAVE BEEN TAKEN

It is a fundamental rule under the United States and Hawai`i Constitutions that the uncompensated taking of private property is prohibited. The recognition and protection of Hawaiian rights give rise to potential takings claims under two theories: judicial taking and regulatory taking.

A. Judicial Taking

Under the judicial taking theory, when a judicial decision alters property rights, the decision may amount to an unconstitutional taking of property. See Chicago, Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 235, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897); see also Hughes v. Washington, 389 U.S. 290, 296-98, 88 S.Ct. 438, 442-443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring) (suggesting that a state supreme court's decisionthat the state owned accreted land built up by the oceanamounted to a sudden, unpredictable, and unforeseeable change in state property law, which amounted to an unconstitutional judicial taking). However, the judicial taking theory is "by no means a settled issue of law." Corporation of Presiding Bishop v. Hodel, aff'd, 830 F.2d 374, 381 (D.C.Cir.1987) (declining to decide the question whether a judicial taking occurred), affirming 637 F.Supp. 1398 (D.D.C. 1986); see also Hodel, 637 F.Supp. at 1407 (rejecting a takings claim based on a decision by the High Court of American Samoa). Assuming, without deciding, that the theory is viable, a judicial decision would only constitute an unconstitutional taking of private property if it "involve[d] retroactive alteration of state law such as would constitute an unconstitutional taking of private property." Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 337 n. 2, 94 S.Ct. 517, 531, 38 L.Ed.2d 526 (1973) (Stewart, J., dissenting).[45]
In the instant case, Nansay argues that the recognition of traditional Hawaiian rights beyond those established in Kalipi and Pele would fundamentally alter its property rights. However, Nansay's argument places undue reliance on western understandings of property law that are not universally applicable in Hawai`i. Moreover, Hawaiian custom and usage have always been a part of the laws of this State. Therefore, our recognition of customary and traditional Hawaiian rights, as discussed in section IV.B., supra, does not constitute a judicial taking.

B. Regulatory Taking

A regulatory taking occurs when the government's application of the law to a *1273 particular landowner denies all economically beneficial use of his or her property without providing compensation. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, ___, 112 S.Ct. 2886, 2895, 120 L.Ed.2d 798 (1992). However, not every limitation on the use of private property will constitute a "taking." For instance, the government "assuredly [can] ... assert a permanent easement that [reflects] a pre-existing limitation upon the landowner's title." Lucas, 505 U.S. at ___, 112 S.Ct. at 2900. Furthermore, conditions may be placed on development without effecting a "taking" so long as the conditions bear an "essential nexus" to legitimate state interests and are "roughly proportional" to the impact of the proposed development. Dolan v. City of Tigard, ___ U.S. ___, ___-___, 114 S.Ct. 2309, 2317-19, 129 L.Ed.2d 304 (1994).
In the instant case, the HPC must consider PASH's alleged customary rights on remand. As we have held in section IV.B.5.d. of this opinion, if such rights are established, the HPC will be obligated to protect them to the extent possible. This may involve the placement of conditions on Nansay's permit to develop its land. No determination as to the extent of any applicable limitations on Nansay's ability to develop its land may be made until the HPC holds a contested case hearing in accordance with this opinion. For that reason, we agree with Nansay that any claim alleging a regulatory taking would be premature at this time. See, e.g., Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 185-86, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1984); cf. Robinson v. Ariyoshi, 441 F.Supp. 559, 585-86 (D.Haw.1977), aff'd, 753 F.2d 1468, 1474 (9th Cir.1985), vacated, 477 U.S. 902, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986), dismissed, 887 F.2d 215 (9th Cir.1989).[46]

VI. CONCLUSION

This court has jurisdiction over the instant appeal under HRS § 91-14. Having effectively curtailed PASH from developing a complete record, Nansay and the HPC cannot complain about a procedural remand. The CZMA requires the HPC to give the cultural interests asserted by PASH "full consideration." In addition, both the CZMA and article XII, section 7 of the Hawai`i Constitution (read in conjunction with HRS § 1-1), obligate the HPC to "preserve and protect" native Hawaiian rights to the extent feasible when issuing a SMA permit. Finally, this decision does not effect a judicial taking of Nansay's private property because it is grounded in preexisting principles of State property law.
Accordingly, we affirm the ICA's decision and remand to the HPC for further proceedings consistent with the foregoing analysis.
NOTES
[1] An "ahupua`a" is a land division usually extending from the mountains to the sea along rational lines, such as ridges or other natural characteristics. In re Boundaries of Pulehunui, 4 Haw. 239, 241 (1879) (acknowledging that these "rational" lines may also be based upon tradition, culture, or other factors).
[2] HPC Rule 9-11(B) provides that a "hearing shall be conducted within a period of ninety calendar days from the receipt of a properly filed petition [for a SMA permit] ... [and] all interested parties shall be afforded an opportunity to be heard." Id.
[3] A written petition is not required until twenty days after the HPC determines that contested case procedures are required and publishes notice in a newspaper of general circulation in the county. HPC Rule 4-6(b)(2).

In addition to PASH and Pilago, the HPC also received several requests concerning an alleged prescriptive easement over a jeep trail fronting the development area. The HPC postponed its hearing on Nansay's application for a scheduled sixty days so that these other groups and individuals could resolve the jeep trail issue through mediation or a declaratory action. Prior to reconvening the hearing, the other parties settled their claims with Nansay. Only PASH and Pilago, both of whom apparently did not pursue declaratory actions, had not settled their concerns with Nansay when the HPC resumed its deliberations on Nansay's permit application.
[4] HPC Rule 4-2(6)(B) provides in relevant part:

"Party" ... includes the following, upon the filing of timely requests[,] ... [a]ny person who has some property interest in the land, who lawfully resides on the land, or who can demonstrate that that person will be so directly and immediately affected by the [HPC's] decision that that person's interest in the proceeding is clearly distinguishable from that of the general public; provided that such agency or person must be specifically named or admitted as a party before being allowed to participate in a contested case hearing.
[5] PASH and Pilago did not brief or argue jurisdiction under HRS § 205A-6, which permits a civil action alleging failure to comply with the Coastal Zone Management Act, because they believed "that it would have been inconsistent to have attacked the permit itself while still claiming error in the [HPC's] denial of a contested case hearing." Public Access Shoreline Hawaii v. Hawaii County Planning Comm'n [PASH I], 79 Hawai`i 246, 249 n. 1, 900 P.2d 1313, 1316 n. 1 (App.1993). See Punohu v. Sunn, 66 Haw. 485, 487, 666 P.2d 1133, 1135 (1983) (holding that a declaratory judgment action would not lie where a specific remedy was available under HRS § 91-14). However, assuming that the primary jurisdiction doctrine does not apply because the HPC's decision-making process has concluded and there is no administrative appeal process to pursue, see The Aged Hawaiians v. Hawaiian Homes Comm'n, 78 Hawai`i 192, 202, 891 P.2d 279, 289 (1995), the circuit courts would appear to have original jurisdiction under HRS § 205A-6 to hear either a procedural or substantive challenge to the agency's action. Cf. Kona Old Hawaiian Trails v. Lyman, 69 Haw. 81, 92-94, 734 P.2d 161, 168-69 (1987). This would be the case notwithstanding a particular claimant's designation of the claim as an "appeal" rather than an original action. In re Eric G., 65 Haw. 219, 224, 649 P.2d 1140, 1144 (1982). In the instant case, we need not further discuss PASH and Pilago's claims under HRS § 205A-6 because we decide the issue of jurisdiction under HRS § 91-14. See infra section III.
[6] At the hearing before the HPC, Nansay did not directly dispute the assertion that unnamed members of PASH possess traditional native Hawaiian gathering rights at Kohanaiki, including food gathering and fishing for `&omacr;pae, or shrimp, which are harvested from the anchialline ponds located on Nansay's proposed development site. See, e.g., HRS § 174C-101 (Supp.1992) (indicating that "traditional and customary rights shall include, but not be limited to ... the gathering of [h&imacr;h&imacr;wai], [`o`opu], limu, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural and religious purposes"). Pilago's similarly undisputed concern and interest was that the area of the planned development would destroy important cultural sites, possibly including the burial site of King Kamehameha I.
[7] HRS § 91-14(a) (Comp.1993) provides:

Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is party to a contested case proceeding before that agency or another agency.
Although the last sentence of this provision did not become effective until May 20, 1993, see County of Hawai`i v. Civil Service Comm'n, 77 Hawai`i 396, 401, 885 P.2d 1137, 1142 (App. 1994), that fact does not prevent the HPC from appealing an adverse decision by the circuit court to the ICA or to this court. See Fasi v. Hawai`i Pub. Employment Relations Bd., 60 Haw. 436, 442, 591 P.2d 113, 117 (1979).
[8] HRS § 205A-29(a) provides, in pertinent part:

The authority in each county ... shall establish and may amend pursuant to chapter 91, by rule or regulation the [SMA] use permit application procedures, conditions under which hearings must be held, and the time periods within which the hearing and action for [SMA] use permits shall occur.... Any rule or regulation adopted by the authority shall be consistent with the objectives, policies, and [SMA] guidelines provided in this chapter. Action on the special management permit shall be final unless otherwise mandated by court order.
(Emphases added.)
[9] The Maui Planning Commission Rules of Practice and Procedure (MPC Rules) currently provide for formal intervention (see MPC Rules §§ 12-201-39 to -46) and for appeal to the circuit court from denial thereof (see MPC Rules § 12-201-46) but make no provision for appeal of a SMA permit decision. Because Maui County Charter § 8.5.4 specifically restricts appeals to the Board of Appeals from those actions concerning "zoning, subdivision and building ordinances[,]" action on a SMA permit by the MPC is final and, therefore, appealable under the HAPA. See also L&amacr;na`i Planning Commission Rules (forthcoming, pursuant to Maui County Charter Amendment, as required by 1992 General Election Question No. 3, calling for a separate planning commission on L&amacr;na`i).

The Rules of Practice and Procedure for the Moloka`i Planning Commission (Moloka`i PC Rules) currently provide for formal intervention and contested case procedures (see Moloka`i PC Rules §§ 12-1-25 to -31), appeal to the circuit court from the denial of intervention (see id. § 12-1-31), and "judicial review of [all other] decisions and orders ... in the manner set forth in HRS § 91-14." See id. § 12-1-61.
The Rules of Practice and Procedure of the County of Kaua`i, Planning Commission (KPC Rules) currently provide for formal intervention. See KPC Rule 1-4-1. Furthermore, "[a]ny person aggrieved by a final order and decision of the Planning Commission may obtain judicial review thereof in the manner pursuant to HRS [chapter] 91." KPC Rule 1-6-18(i).
[10] HPC Rules 9-10(D) and (E) omit the hearing requirement for SMA minor permit applications.
[11] Nansay claims that Hawai`i appellate court opinions dealing with judicial review of agency decisions reflect an inconsistent legal analysis. Thus, Nansay suggests that PASH should have pursued alternative judicial measures, such as an action for an injunction or a declaratory judgment, rather than seeking appellate review under HRS § 91-14. See Bush, 76 Hawai`i at 136-37, 870 P.2d at 1280-81; Town v. Land Use Comm'n, 55 Haw. 538, 557, 524 P.2d 84, 96 (1974) (Ogata, J., dissenting, joined by Richardson, C.J.). The disparity perceived by Nansay between court holdings based on procedural and substantive errors in agency decision-making merely reflects application of a two-part test for determining whether a particular proceeding was a "contested case" under HRS § 91-1(5). In their dissent, Justices Ogata and Richardson disagreed with the Town majority's application of this nascent test. The dissent believed that the agency hearing, although required by law, was not a contested case. Town, 55 Haw. at 556-57, 524 P.2d at 96. The dissenting opinion erroneously focused on the appellee's characterization of the hearing as a rule-making procedure. Id. at 556, 524 P.2d at 95. The majority, on the other hand, correctly concluded that the process for boundary amendment is not rule-making because it is "adjudicative of legal rights of property interests in that it calls for the interpretation of facts applied to rules that have already been promulgated [.]" Town, 55 Haw. at 548, 524 P.2d at 91 (emphasis added).
[12] HRS § 205A-30 requires "specific procedures... for the issuance of ... [SMA] minor permits,... and judicial review from the grant and denial thereof."
[13] HPC Rule 4-6(h) provides that "[a]ny petitioner who has been denied standing as a party may appeal such denial to the circuit court pursuant to section 91-14, [Hawai`i] Revised Statutes." The HPC Rules apparently provide an alternative means of obtaining judicial review: "Approval or denial of the petition [for a SMA permit] shall be final and appealable to the Third Circuit Court of the State of [Hawai`i] in accordance with Chapter 91, HRS, as amended." HPC Rule 9-11(D)(5) (emphasis added).
[14] Counsel for the HPC suggested that if the contested case request were to be denied, PASH "should probably wait for the decision [of the circuit court]; and then the Supreme Court will determine whether [its] participation in the public hearing was sufficient standing for [it] to appeal from that decision."
[15] We stated in Akau that "a member of the public has standing to enforce the rights of the public even though his injury is not different in kind from the public's generally, if he can show that he has suffered an injury in fact, and that the concerns of a multiplicity of suits are satisfied by any means, including a class action." Akau, 65 Haw. at 388-89, 652 P.2d at 1134. The necessary elements of an "injury in fact" include: 1) an actual or threatened injury, which 2) is traceable to the challenged action, and 3) is likely to be remedied by favorable judicial action. See Puna Geothermal, 77 Hawai`i at 70, 881 P.2d at 1216; accord Pele Defense Fund v. Paty [Pele], 73 Haw. 578, 615, 837 P.2d 1247, 1257-58 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993). In other words, individuals or groups requesting contested case hearing procedures on a SMA permit application before the HPC must demonstrate that they will be "directly and immediately affected by the Commission's decision[.]" HPC Rule 4-2(6)(B). However, standing requirements are not met where a petitioner merely asserts "value preferences," which are not proper issues in judicial (or quasi-judicial) proceedings. Puna Geothermal, 77 Hawai`i at 70, 881 P.2d at 1216. Although the HPC Rules do not expressly require petitioners to detail the nature of their asserted interests in writing until after the HPC has determined whether a contested case hearing is required, see HPC Rules 4-6(b) and (c), a petitioner who is denied standing without having had an adequate opportunity to identify the nature of his or her interest may supplement the record pursuant to HRS § 91-14(e).

The cultural insensitivity demonstrated by Nansay and the HPC in this caseparticularly their failure to recognize that issues relating to the subsistence, cultural, and religious practices of native Hawaiians amount to interests that are clearly distinguishable from those of the general publicemphasizes the need to avoid "`foreclos[ing] challenges to administrative determinations through restrictive applications of standing requirements.'" Mahuiki, 65 Haw. at 512, 516, 654 P.2d at 878, 880 (quoting Life of the Land v. Land Use Comm'n, 63 Haw. 166, 171, 623 P.2d 431, 438 (1981)).
[16] Upon granting certiorari, we allowed the parties to submit supplemental briefs concerning issues raised in the application for writ of certiorari. See HRS § 602-59(d). After reviewing these submissions, we then requested additional briefing on the following issues: (1) to what extent should native Hawaiian gathering rights on undeveloped land be protected when that same land is under consideration for development permits, and does the HPC have legal authority to condition a SMA permit on protection of those rights; (2) what criteria should be considered in determining whether the proposed development would infringe upon native Hawaiian rights; and (3) at what point, if any, does the protection of native Hawaiian rights in the land being developed implicate the "Takings Clause" of the Hawai`i and the United States Constitutions? The extensive briefing of these issues included submissions by numerous amici curiae: the Kona Hawaiian Civic Club, Ka Lahui Hawai`i, the Land Use Research Foundation, Pele Defense Fund, the Office of Hawaiian Affairs, the State of Hawai`i, the `Ohana Council, and (collectively) Protect Kohanaiki `Ohana, Inc., the Kalamaula Homestead Association, and the Native Hawaiian Environmental Defense Fund.
[17] Limited exceptions to the "[no] significant adverse effect" requirement are available where such impact is minimized to the extent practicable, or is clearly outweighed by public health, safety, or compelling public interest. HPC Rule 9-11(C).
[18] The SMA guidelines are contained in HPC Rule 9-7, which essentially tracks HRS §§ 205A-26(1) and (2). HPC Rule 9-7(A) directs certain minimizing efforts where reasonable. HPC Rule 9-7(B) substantially parallels HPC Rule 9-11(C), differing by the addition of a provision that includes the cumulative impact of separate development proposals as potentially significant adverse effects.
[19] The definition of a "significant adverse effect[,]" see citations to HPC Rule 9-10(H), infra this section, appears in the context of the HPC's threshold determination of qualification for a SMA minor permit versus a SMA use permit. The Director may issue a SMA minor permit only after the following events take place: (1) the Director determines that a proposed project (a) will not have a significant adverse effect and (b) does not exceed $125,000.00 in valuation; and (2) the Chief Engineer reviews the proposed project and makes a recommendation. HPC Rule 9-10(E).
[20] The State, as amicus curiae, asserts title to the anchialline ponds as "public trust" lands by virtue of the fact that they are affected by the tides. Although we do not decide this issue, we recognize that the CZMA clearly requires protection and preservation of public "coastal" areas. See 16 U.S.C. § 1454(b)(7) (1985) (requiring each state to create a planning process that provides adequate protection of such resources before federal approval is granted and funding will be made available); 16 U.S.C. § 1455(d)(2)(G) (Supp.1993) (requiring a Secretarial finding to that effect).
[21] See also Laws of Her Majesty Liliuokalani, Queen of the Hawaiian Islands 91 (1892) [hereafter L. 1892], ch. LVII, § 5 (providing for exceptions to the English common law where "established by Hawaiian national usage") (emphasis added). Although references to the provisions contained in HRS § 1-1 generally focus on the 1892 statute as its predecessor, an examination of historical developments suggests that the principles codified in this statute have much earlier origins. One of the initial attempts to codify the laws of Hawai`i indicated that "[t]he Hawaiian kingdom was governed until the year 1838, without other system than usage, and with a few trifling exceptions, without legal enactments." 1 Statute Laws of His Majesty Kamehameha III, King of the Hawaiian Islands 3 (1845-46) [hereafter L. 1845-46] (emphasis added). As the kingdom developed further, written laws were promulgated to secure civil liberties and to codify the constitutional monarchy that emerged. See infra section IV.B.4 (discussing the development of private property rights in Hawai`i). For example, the first two Acts of Kamehameha III established the Executive Department, including five Ministers and a Privy Council. These initial acts of Kamehameha III dramatically restructured Hawaiian society, but also retained many cultural elements deemed crucial to the survival of the nation's native people. See infra note 33 (noting that part of the second Act preserved "native usages in regard to landed tenures"); see also infra note 24 (indicating that the titles issued for particular parcels of property typically contained provisions expressly reserving "tenant" rights).

The third Act of Kamehameha III created an independent Judiciary. Act of September 7, 1847, ch. I, § IV; 2 Statute Laws of His Majesty Kamehameha III, King of the Hawaiian Islands (1847) [hereafter L. 1847]. The Judiciary was given the authority to cite and adopt "[t]he reasonings and analysis of the common law, and of the civil law [of other countries] ... so far as they are deemed to be founded in justice, and not in conflict with the laws and usages of this kingdom." L. 1847, at 5 (emphasis added). Shortly thereafter, on September 27, 1847, the House of Nobles and Representatives passed a resolution calling for the preparation of a civil code. As eventually codified, chapter III, § 14 of the Code provided: "[t]he Judges ... are bound to proceed and decide according to equity.... To decide equitably, an appeal is to be made ... to received usage, and resort may also be had to the laws and usages of other countries." The Civil Code of the Hawaiian Islands ch. III, § 14, at 7 (1859) [hereafter 1859 Civil Code] (emphases added). See also id. at 195 (prohibiting "conflict with the laws and customs of this kingdom" in § 823) (emphasis added). Finally, §§ 14 and 823 of the 1859 Civil Code were expressly repealed in "An Act to Reorganize the Judiciary Department," the very same legislation that codified the provision now referred to as HRS § 1-1. See L. 1892, at 123-24.
[22] HRS § 7-1, which has not undergone significant change since the 1851 enactment that amended an earlier version of the statute, provides:

Building materials, water, etc.; landlords' title subject to tenants' use. Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided that this shall not be applicable to wells and watercourses, which individuals have made for their own use.
(Emphases added.) See Act of July 11, 1851, reprinted in Laws of His Majesty Kamehameha III, King of the Hawaiian Islands 98-99 (1851) [hereafter L. 1851]. The 1851 enactment deleted provisions established the previous year, which required that persons wishing to exercise such rights must obtain the "landlord['s] ... consent." See Act of August 6, 1850, § 7, reprinted in Laws of His Majesty Kamehameha III, King of the Hawaiian Islands 202, 203-04 (1850) [hereafter L. 1850]; see also infra section IV.B.4 (discussing both the 1850 enactment and its apparent predecessor, quoted infra note 34, which was enacted in 1846).
The term "landlord" appears to be a loose translation of "konohiki" from the Hawaiian language versions of these acts. The word "konohiki" is defined as "[h]eadman of an ahupua`a land division under the chief." Pukui & Elbert, Hawaiian Dictionary 166 (2nd ed.1986).
[23] On the contrary, however, "[a]ll the witnesses who testified regarding traditional custom testified that the custom requires that anyone seeking access to the ahupua`a may only exercise those rights in the uninhabited portions of the ahupua`a where that person is a tenant, always respecting the private areas of other tenants." Kalipi's Reply Brief (No. 6957) at 11 (emphases added). Furthermore, as Kalipi understood his asserted gathering rights, "custom require[d] that anything planted and cared for by people should be left alone." Kalipi's Opening Brief (No. 6957) at 49 (emphasis added).
[24] The court in Kalipi also addressed the "kuleana" reservation in the title to the lands in question. The "kuleana" reservation provides, "`Koe nae no kuleana a na kanaka moloko,' [which was] translated at trial to mean `the kuleanas [sic] of the people therein are excepted' ... [, and which thereby states the government's intention to] `... hereby declare these lands to be set apart as the lands of the Hawaiian Government, subject always to the rights of tenants.'" Kalipi, 66 Haw. at 12, 656 P.2d at 752 (emphasis added). Although the court withheld comment on the precise scope of this alternative source of gathering rights, see Kalipi, 66 Haw. at 12-13, 656 P.2d at 752, it nevertheless indicated that Territory v. Liliuokalani, 14 Haw. 88, 95 (1902) (holding that a similar reservation did not incorporate any public right to the use of certain shoreline areas included within a grant of land), does not necessarily dispose of the "kuleana" reservation as a source of additional gathering rights beyond HRS § 7-1. Id. at 12, 656 P.2d at 752.

The word "kuleana" is defined as, inter alia, "[r]ight, privilege, concern, responsibility, ... [or] small piece of property, as within an ahupua`a [.]" Pukui & Elbert, Hawaiian Dictionary 179 (2nd ed. 1986). The word "kanaka" is defined, inter alia, as "person, individual, ... subject, as of a chief; laborer, ... Hawaiian[.]" Id. at 127.
[25] These included the gathering of items not delineated in § 7-1 and the use of defendants' lands for spiritual and other purposes. Id. at 10 n. 4, 656 P.2d at 751 n. 4.
[26] The elements of the common-law doctrine of custom, as set forth in 1 W. Blackstone, Commentaries 76-78 (Sharwood ed. 1874) [hereafter Blackstone's Commentaries] are that the alleged custom must be, or have been:

(1) exercised so long "that the memory of man runneth not to the contrary"according to subsequent commentators, "long and general" usage is sufficient, see, e.g., State ex rel. Thornton v. Hay, 254 Or. 584, 596, 462 P.2d 671, 677 (Or.1969) (citing Professor Cooley's edition of the Commentaries);
(2) without interruption (as to the right versus exercise thereofi.e., continuous exercise is not required: "the custom is not destroyed, though they do not use it for ten years; it only becomes more difficult to prove");
(3) peaceable and free from dispute (i.e., exercised by consent);
(4) reasonablei.e., "of artificial and legal reason, warranted by authority of law" and appropriate to the land and the usages of the community;
(5) certain;
(6) obligatory or compulsory (when established); and
(7) consistent with other customs.
[27] Kalipi implicitly rejected the Hawaiian Trust Company's argument, which was based on language in Oni to the effect that the rights provided by the Act of August 6, 1850, were declarative of "all the specific rights of the [hoa`&amacr;ina] (except fishing rights) which should be held to prevail against the fee simple title of the konohiki[.]" 2 Haw. at 95.

The English version of the 1850 Act uses the term "people," which was held to be synonymous with the word "hoa`&amacr;ina." Id. at 96. The word "hoa`&amacr;ina" is defined as "[t]enant, caretaker, as on a kuleana." Pukui & Elbert, Hawaiian Dictionary 73 (2nd ed. 1986). Meanwhile, the term "tenant" includes "one who holds or possesses real estate or sometimes personal property... by any kind of right[.]" Webster's Third New Int'l Dictionary 2354 (1967 ed.) (emphasis added). Therefore, it is possible to construe the term "tenant" so as to incorporate the traditional native Hawaiian concept of a cultural link to the land. See McBryde Sugar Co. v. Robinson [McBryde II], 55 Haw. 260, 289 n. 29, 517 P.2d 26, 42 n. 29 (1973) cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974) (Levinson, J., dissenting) (suggesting the need for comparative analysis of bilingual statutes because the English version is binding under HRS § 1-13 only when there is a "radical or irreconcilable difference" between the two versions); In re Ross, 8 Haw. 478, 480 (1892) ("[t]he effort is always made to have [the two versions] exactly coincide, and the legal presumption is that they do"). See also infra note 35 (discussing the definition of "maka`&amacr;inana"). Nevertheless, we recognize that the Hawaiian language version of this Act actually uses the word "kanaka." See supra note 24.
[28] Immediately prior to its substantive analysis, the court in Kalipi summarily stated:

Kalipi asserts that it has long been the practice of him and his family to travel the lands of the Defendants in order to gather indigenous agricultural products for use in accordance with traditional Hawaiian practices....
A trial was had and the jury, by special verdict, determined that Kalipi had no such right. He now alleges numerous errors in the trial court's instructions to the jury and conduct of the trial. We find, for the reasons stated below, that none of the alleged errors warrants reversal.
Kalipi, 66 Haw. at 3-4, 656 P.2d at 747 (emphases added). Nevertheless, the undisputed facts of the case reveal that the jury asked the trial court, "May we please have the book with the 1892 reference to rights in question ... [i.e., Special Verdict Interrogatory Number 8]?" The trial court responded by instructing the jury to disregard Special Verdict Interrogatory Number 8, which read: "Did Hawaiian custom and usage as of 1892 include the right of a tenant of land in an [ahupua`a] to gather native products from his [ahupua`a]?" See Kalipi's Opening Brief (No. 6957) at 14, 53-57; Hawaiian Trust's Answering Brief (No. 6957) at 52-54.
Although Jury Instruction No. 21 already contained the 1892 reference (i.e., the text of HRS § 1-1), it is difficult to reconcile the trial court's response, or the appellate court's conclusion that there was no reversible error, with the implicit rejection of related Jury Instruction No. 19 in Kalipi. See supra note 27 & accompanying text (rejecting an argument based on parallel language from Oni). Jury Instruction No. 19 read:
If you find that prior customs, usages and practices with respect to rights of kuleana owners have been superseded or abrogated by the enactment of [HRS] § 7-1 or its predecessor statutes, then you may find that the specific rights which are enumerated in [HRS] § 7-1 are all of the rights ... which Plaintiff may be entitled to exercise.
Kalipi's Opening Brief (No. 6957) at 54 (emphases added); Hawaiian Trust's Answering Brief (No. 6957) at 10 (emphases added).
[29] Kalipi focused on his status as a landowner merely as an attempt to show that he belonged to the class of persons intended to benefit under HRS § 7-1. See Kalipi's Opening Brief (No. 6957) at 28 (citing McBryde Sugar Co. v. Robinson, 54 Haw. 174, 192, 504 P.2d 1330, 1341 (defining "people" in HRS § 7-1 parenthetically as "meaning owners of land"), aff'd upon rehearing, 55 Haw. 260, 517 P.2d 26 (1973), appeal dismissed and cert. denied, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974)). In other words, Kalipi claimed that the statute preserved access and gathering rights as an incident of ownership, so long as these rights were utilized for valid purposes associated with that particular site. Cf. Damon v. Tsutsui, 31 Haw. 678, 687 (1930); Smith v. Laamea, 29 Haw. 750, 755-56 (1927); Haalelea v. Montgomery, 2 Haw. 62, 71 (1858) (interpreting the term "tenant" so as to pass the common right of piscary to the grantee, through sale or other conveyance, as an appurtenance to the land). The claim in Oni involved a purported right of pasturage arising primarily from the claimant's status as a landowner. 2 Haw. at 90. To the extent that Oni's claims might have otherwise been based on ancient tenure, he abandoned these claims by entering into a special contract to provide labor for the konohiki in exchange for the right to pasture his horses. Id. at 91.
[30] Before 1820 the foreigners who became residents of Hawai`i and who acquired land were predominantly of a humble status, commonly sailors. They conformed, in matters of property, to the customs of the country. After 1820 conditions changed.... Foreigners began to deal with their property as they would have done in their home countries; in doing so they sometimes violated Hawaiian customs. On the other hand, the native authorities treated the property of foreigners as they did that of their own subjects, thus creating much dissatisfaction.... [A]fter 1830 there were many cases arising out of alleged violations of the land and property rights of foreigners. Foreigners began to deny the right of the government to arbitrarily dispossess them of land or to prevent the transfer of property from one foreigner to another, and they appealed to their own governments for protectionsuccessfully in some instances.

Kuykendall at 137-38 (emphases added).
"Westerners entered ... land usage patterns [in Hawai`i when certain] ... foreign settlers were `given' lands by the [K]ing or chiefs in return for services or merely out of traditional Hawaiian generosity." Levy, "Native Hawaiian Land Rights," 63 Cal.L.Rev. 848, 850 (1975). See Keelikolani v. Robinson, 2 Haw. 514 (1862) (describing an 1827 agreement involving the grant of rights in a Honolulu wharf, which were provided in exchange for payment of half the expenses of maintaining the wharf and half of any proceeds collected therefrom). However, foreigners who received land in Hawai`i "held it by the same precarious tenure as native subjects, simply at the pleasure of the [K]ing." Kuykendall at 73; see also 1 Privy Council Records 149 (1845-46) ("we indeed did wish to give Foreigners lands ... but to the natives they are revertable") (emphasis added).
[31] Many of the King's advisors urged him to let them fire upon the invading forces, "but the usual pacific course prevailed." Kuykendall, at 214. After Rear Admiral Richard Thomas rejected the provisional cession and reconfirmed Hawaiian sovereignty, "[t]he King is said to have made use of the expression which became the motto of [Hawai`i], Ua mau ke ea o ka aina i ka pono (`The life of the land is preserved in righteousness')." Id. at 220 n. 47.
[32] The accompanying reply from the Privy Council, which was approved without dissent by the nation's legislators, reveals the government's rationale: "formerly there were many difficulties, and the land was taken; it was not taken because the government was really in wrong, but because evil was sought. Here is the difficulty which ruins the government, viz: the complaint of foreign governments followed by the infliction of punishment." The Friend at 118 (emphasis added). Furthermore, regarding the sale of land to foreigners:

it is by no means proper to sell land to aliens, nor is it proper to give them land, for the land belongs to Kamehameha III.; there is no chief over him. But we think it is proper to sell land to his Majesty's people, that they may have a home. But if these persons wish to sell their lands again, they cannot sell to aliens, for there is only one sovereign over those who hold the lands; but if the people wish to sell to those who have taken the oath of allegiance, they can do so, for Kamehameha III is over them.... There has not been much land sold, but foreigners have heretofore occupied lands through favor, without purchasing. It is better to sell.
Id.
[33] Specifically, the Land Commission was constrained to make its decisions regarding interests in land "in accordance with the principles established by the civil code of this kingdom in regard to ... occupancy, ... [and] native usages in regard to landed tenures[.]" Act of April 27, 1846, pt. I, ch. VII, art. IV, § 7; L. 1845-46, at 109, reprinted in 2 Revised Laws of Hawaii 2123 (1925).
[34] The Act of November 7, 1846, "Joint Resolutions on the Subject of Rights in Lands and the Leasing, Purchasing and Dividing of the Same," also codified certain gathering rights:

The rights of the Hoaaina [sic] in the land consist of his own taro patches, and all other places which he himself cultivates for his own use; and if he wish to extend his cultivation on unoccupied parts, he has the right to do so. He has, also, rights in the grass land, if there be any under his care, and he may take grass for his own use or for sale, and may also take fuel and timber from the mountains for himself. He may also pasture his horse and cow and other animals on the land, but not in such numbers as to prevent the konohiki from pasturing his. He cannot make agreement with others for the pasturage of their animals without the consent of his konohiki, and the Minister of Interior.
Id., § 1, reprinted in 2 Statute Laws of His Majesty Kamehameha III, King of the Hawaiian Islands 70 (1847) [hereafter L. 1847] (emphasis in original); cf. 3 Kent's Commentaries 404 (12th ed. 1989) (discussing "rights of common").
[35] The word "maka`&amacr;inana" is defined as "[c]ommoner, populace, people in general; citizen, subject ... people that attend the land." Pukui & Elbert, Hawaiian Dictionary 224 (2nd ed. 1986). Our observations concerning the interpretation of "hoa`&amacr;ina" and "tenant" as incorporating traditional Hawaiian cultural attitudes toward the land, see supra note 27, are further supported by this legislative history. See also Kent, Treasury of Hawaiian Words 386 (1986) (defining "maka`&amacr;inana" as, inter alia, the "laboring class, which was resident on the land they worked and transferred with it when ownership changed").

The bracketed phrase "should they need them" was inserted in the subsequent enactment of August 6, 1850, see L. 1850, at 202, along with the additional requirement that "[t]hey shall also inform the landlord or his agent, and proceed with his consent." Id. However, these phrases were deleted the following year. See supra note 22.
[36] See also In re Ashford, 50 Haw. 314, 440 P.2d 76 (1968) ("[Hawaiian] land laws are unique in that they are based upon ancient tradition, practice and usage.").
[37] In Kalipi, the court added the following dictum after enunciating its balancing test for retention of HRS § 1-1 rights: "[t]he relevant inquiry is ... whether the privileges which were permissibly or contractually exercised persisted to the point where it had evolved into an accepted part of the culture and whether these practices had continued without fundamentally violating the new system." Id. (emphases added). As indicated in the text above, we disapprove any additional requirements for the establishment of customary rights that might be inferred from this dictum.
[38] The United States Supreme Court has also held that use of the hallucinogenic drug peyote is an unreasonable traditional practice, see Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), as are attempts by religious practitioners to exclude all other uses, including timber harvesting, from sacred areas of the public lands. Lyng v. Northwest Cemetery Protective Ass'n., 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).
[39] The Zimring I court implicitly disapproved the "time immemorial" standard when it indicated that "the Hawaiian usage mentioned in HRS § 1-1 is usage which predated November 25, 1892." 52 Haw. at 475, 479 P.2d at 204. The court in Oni also appears to have misconstrued other elements of the doctrine of custom by concluding that the custom urged in that case was "so unreasonable, so uncertain, and so repugnant to the spirit of the present laws[.]" 2 Haw. at 90. See supra note 26 (listing elements 4, 5, and 7). Contrary to the apparent understanding of the Oni court: (1) "consistency" is properly measured against other customs, not the spirit of the present laws; (2) a particular custom is "certain" if it is objectively defined and applied; certainty is not subjectively determined; and (3) "reasonableness" concerns the manner in which an otherwise valid customary right is exercised in other words, even if an acceptable rationale cannot be assigned, the custom is still recognized as long as there is no "good legal reason" against it. See Blackstone's Commentaries at 76-78.

Although the administrative record in this case only contains specific evidence of shrimp gathering as early as the 1920's, the unrefuted testimony by members of PASH sufficiently established their interests in the SMA permit proceeding for our present purposes. See supra section III.D. Having effectively curtailed PASH from developing a complete record, Nansay cannot complain about a procedural remand. However, Nansay is not precluded from raising the issue of standing on remand. See HRS § 91-9(c).
[40] For the purposes of the HHCA, the term "`native Hawaiian' means any descendant of not less than one half part of the blood of the races inhabiting the Hawaiian islands previous to 1778[.]" HHCA, 1920, § 201(a)(7); Act of July 9, 1921, c. 42, 42 Stat. 108, 108 (codified as amended at 48 U.S.C. note prec. § 491 (1988) and Haw. Const. art. XII, § 1), reprinted in 1 HRS 167, 167 (1985).
[41] We do not decide the question whether descendants of citizens of the Kingdom of Hawai`i who did not inhabit the Hawaiian islands prior to 1778 may also assert customary and traditional rights under the "ancient Hawaiian usage" exception of HRS § 1-1. Furthermore, we expressly reserve comment on the question whether non-Hawaiian members of an "ohana" meaning "[f]amily, relative, kin group; ... extended family, clan[,]" see Pukui & Elbert, Hawaiian Dictionary 276 (2nd ed. 1986)may legitimately claim rights protected by article XII, section 7 of the state constitution and HRS § 1-1. Cf. Morton v. Mancari, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974) ("As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed.").
[42] The sovereign power to enforce the usufruct of lands may not be lost through inaction, because "there cannot be adverse possession against the sovereign." State v. Zimring, 52 Haw. 472, 478, 479 P.2d 202, 204 (1970) (citing Application of Kelley, 50 Haw. 567, 445 P.2d 538 (1968)); cf. Corporation of the Presiding Bishop v. Hodel, 830 F.2d 374, 383 (D.C.Cir.1987) (indicating that communal land in American Samoa is not eligible for taking by adverse possession), affirming 637 F.Supp. 1398 (D.D.C.1986).
[43] The State's power to regulate the exercise of customarily and traditionally exercised Hawaiian rights, see Haw. Const. article XII, § 7, necessarily allows the State to permit development that interferes with such rights in certain circumstancesfor example, where the preservation and protection of such rights would result in "actual harm" to the "recognized interests of others." Kalipi, 66 Haw. at 12, 656 P.2d at 752. Nevertheless, the State is obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible.
[44] In accordance with HRS § 5-7.5(b), we are authorized to "give consideration to the `Aloha Spirit'." The Aloha Spirit "was the working philosophy of native Hawaiians[;] ... `Aloha' is the essence of relationships in which each person is important to every other person for collective existence." HRS § 5-7.5(a).
[45] The majority in Bonelli mentioned the judicial taking theory, but did not rely upon it, in reversing the judgment of the Arizona Supreme Court. In addition, Bonelli was overruled on other grounds in Oregon v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) (overruling Bonelli to the extent that it called for application of federal common law to determine ownership of a river bed in Oregon).
[46] The United States Court of Appeals for the Ninth Circuit "conclude[d] that even if the State of [Hawai`i] has placed a cloud on the title of the various private owners, this inchoate and speculative cloud is insufficient to make this controversy ripe for review." 887 F.2d at 218-19.